UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANGLERS OF THE AU SABLE; and
SIERRA CLUB (MACKINAC CHAPTER)

        Plaintiffs,

v.                                                          Case Number 05-10152-BC
                                                            Honorable David M. Lawson

UNITED STATES FOREST SERVICE; and
U.S. BUREAU OF LAND MANAGEMENT,

        Defendants.
_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

This matter is before the Court on the plaintiffs' motion for a temporary restraining order and preliminary injunction seeking to prevent site preparation for exploratory oil and gas drilling in the Huron-Manistee National Forest scheduled to begin on December 7, 2005 by Savoy Energy, LP, the holder of a permit issued by the defendants, the United States Forest Service and the United States Bureau of Land Management. On September 5, 2005, the plaintiffs filed an eight-count, amended complaint seeking a declaration that the defendants violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, the National Forest Management Act, 16 U.S.C. § 1604, the Mineral Leasing Act, 43 U.S.C. § 3160, and the Administrative Procedures Act, 5 U.S.C. § 555 *et seq.*, by conducting a faulty environmental assessment, improperly issuing a "Finding of No Significant Impact" (FONSI), and failing to prepare and issue an environmental impact statement concerning the project. The Court referred the matter to Magistrate Judge Charles E. Binder for general case management.

On December 2, 2005, the plaintiffs filed their motion for preliminary injunctive relief alleging that drilling operations were to begin on December 7, 2005. Because of the need to address the issues raised in the motion immediately, and because the magistrate judge is without authority (absent consent of the parties) to grant injunctive relief, *see* 28 U.S.C. § 636(b)(1)(A), the Court withdrew the order of reference for the purpose of considering the plaintiffs' motion and ordered the defendants to file a response, which has been received. The Court has reviewed the submissions and finds that the relevant law and facts have been set forth in the motion papers and that oral argument will not aid in the disposition of the motions. Accordingly, it is **ORDERED** that the motions be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2).

The plaintiffs contend that an injunction should issue because the site preparation will cause irreparable harm to the environment, the defendants will suffer only negligible harm as a result of an injunction, and an injunction is in the public interest to preserve the *status quo* while the merits of the claim are fully addressed. The Court now finds that the plaintiffs have presented substantial questions as to whether an EIS should have been preformed, site preparation could cause irreparable harm to the environment, the defendants will not be substantially prejudiced by an injunction, and the public interest weighs in favor of temporarily delaying site preparation until the merits can be decided. The Court therefore will grant the plaintiffs' motion for a preliminary injunction and return the matter to the magistrate judge for further pretrial proceedings.

I.

The plaintiffs in this case, Anglers of the Au Sable, Tim Mason, and the Mackinac Chapter of the Sierra Club, are non-profit groups and an individual that seek to protect the Huron-Manistee National Forest from what they believe would be environmental harm. The defendants, the United

States Forest Service and the United States Bureau of Land Management, are charged with management of the Huron-Manistee National Forest and implementing the National Forest Management Act, the National Environmental Policy Act, and the Mineral Leasing Act. Savoy Energy, LP, a private company, has sought and been granted a permit to conduct exploratory gas and oil drilling along side the so-called "Mason Tract" corridor, located on the South Branch of the Au Sable river in Crawford County, Michigan.

At issue in this case is the procedure followed by the defendants in issuing the exploratory drilling permit. Under NEPA, before undertaking any "major Federal action[] significantly affecting the quality of the human environment" the responsible federal agency must provide "a detailed statement by the responsible official on . . . the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). No Environmental Impact Statement (EIS) was prepared in this case before the defendants authorized the drilling permit. However, if, following a properly conducted "Environmental Assessment" (EA), a determination is made that the proposed action will have no significant environmental impact, no environmental impact statement need be prepared. *See* 40 C.F.R. § 1508.9(a); *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 414 (6th Cir. 2004). An agency decision requiring or waiving an EIS is reviewable under the Administrative Procedures Act. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989).

On August 13, 2004, the Forest Service completed an EA pursuant to NEPA. Based on that assessment, it issued a Finding of No Significant Impact on the surrounding environment, which was released on January 27, 2005. Because of that finding, the Forest Service did not conduct any

further assessment or prepare an EIS.  On August 4, 2005, the Bureau of Land Management approved Savoy's application to conduct exploratory drilling.

According to the plaintiffs, site preparation will include the clearing of a 3.5-acre well site, logging and clearing of the land, and widening the road.  The proposed site is located in an area of old-growth forest that also is designated as a semi-primitive, non-motorized area.  The company apparently will also clear cut and fill the area to grade and level it.  The proposed site for the well is located approximately .6 miles from the South Branch of the Au Sable river, and a portion of that river, the plaintiffs state, has been designated by the State of Michigan as a "natural river." The river is known for trout fishing and is "probably the best brown trout water in the Great Lakes Region" AR at 756.  The river supports tourism, light manufacturing, and forest-related industries.

The Au Sable runs through the Mason Tract, named after George W. Mason and established when he deeded 1,500 acres to the State of Michigan in the 1950s.  Mason apparently conditioned the gift of land on the State's promise to keep it in a "natural state" and not to sell it.  AR at 1257. The land also was to stay " a wilderness, with ascetic values being given major consideration." *Ibid.* Presently, the tract remains free of development except for one campground and a log chapel.  *Id.* at 748.  The roads running through the tract are unimproved and seasonably passable.  The proposed well site is 1650 feet from the tract, and the project would improve the roads and allow for all-season passage by vehicles.  The Mason Tract is designated as a "natural area" by the State.

The South Branch area has been designated as "Management Prescription Area 6.1," a location that it is "semi-primitive [and] non-motorized."  In part, the well, the road improvements, and the flowline installation – the pipe allowing oil and gas to flow from the well to the processing

equipment – would be located in land designated MPA 6.1. This non-motorized area is also designated as old-growth forest under the Forest Plan Amendment #24.

The plaintiffs state that the proposed production facility for the project is about 200 feet from the semi-primitive, non-motorized area and likely will be in operation for twenty to thirty years. The facility, flowline, and pipeline installations will sit in Management Prescription Area 4.5, which is in the "Kirtland Warbler Management Area." The warbler is a species of bird listed as endangered under the Endangered Species Act. The plaintiffs believe that the project will cause noise and habitat fragmentation for a variety of wildlife.

As part of the initial consideration of the project, the Forest Service received 470 comment letters. According to the plaintiffs, a majority of them opposed the project. As part of the EA, an additional two hundred comments were received opposing the project. The plaintiffs explain that presently the project only includes one well; however, if the test well is productive, it is anticipated that Savoy will be allowed to operate three wells. The plaintiffs believe that the EA was based on the assumption that there would be only one well.

On September 5, 2005, the plaintiffs filed an eight-count, amended complaint seeking declaratory and injunctive relief for violations of NEPA (counts one through six); failure to comply with the National Forest Management Act (count seven); and violation of the Mineral Leasing Act (count eight). On November 28, 2005, this Court referred the matter for general case management to Magistrate Judge Charles E. Binder. The magistrate judge held a scheduling conference on December 1, 2005 at which time it became clear that site preparation for the project would begin on December 7, 2005. The plaintiffs then filed a motion for a temporary restraining order and preliminary injunction on December 2, 2005. Thereafter, the Court withdrew the order of reference

for the purpose of considering the plaintiffs' motion.  The defendants have filed a response in opposition.

II.

Although the motion requests the issuance of both a temporary restraining order and preliminary injunction, the former is a procedural remedy implemented on an *ex parte* basis when notice to the opposite party is impractical or would generate additional harm to the applicant.  *See* Fed. R. Civ. P. 65(b); *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974). Notice and an opportunity to be heard was given to the defendants; therefore the Court will deem the request for a temporary restraining order moot.

This Court must consider four factors when determining whether to issue a preliminary injunction: (1) the likelihood of the party's success on the merits of the claim; (2) whether the injunction will save the party from irreparable injury; (3) the probability that granting the injunction will substantially harm others; and (4) whether the public interest will be served by the injunction. *Summit County Democratic Central and Executive Committee v. Blackwell,* 388 F.3d 547, 552 (6th Cir. 2004); *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions,* 134 F.3d 749, 753 (6th Cir. 1998); *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc*., 119 F.3d 393, 399 (6th Cir. 1997); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985).  The Sixth Circuit has explained that one purpose of a preliminary injunction "under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 227 (6th Cir. 1996).

"[T]he four factors are not prerequisites to be met, but rather must be balanced as part of a decision to grant or deny injunctive relief." *Performance Unlimited v. Questar Publishers, Inc.*, 52

-6-

F.3d 1373, 1381 (6th Cir. 1995). The district court need not make specific findings regarding each of the four factors if fewer factors are dispositive of the issue. *See Six Clinics Holding Corp.,* 119 F.3d at 399. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000). The plaintiffs' burden is the same irrespective of whether the relief sough is mandatory or prohibitive. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998).

The Sixth Circuit recently instructed that the likelihood-of-success factor should be analyzed in conjunction with the other factors in the following manner:

> In applying this test, we balance the factors. The Appellant must demonstrate a likelihood of success on the merits to a degree inversely proportional to the amount of irreparable harm that will be suffered if a stay does not issue. "[I]n order to justify a stay of the district court's ruling, the [Appellant] must demonstrate at least serious questions going to the merits and irreparable harm that decidedly outweighs the harm that will be inflicted on others if a stay is granted."

*Family Trust Foundation of Kentucky, Inc. v. Kentucky Judicial Conduct Comm'n,* 388 F.3d 224, 227 (6th Cir. 2004). Although the court of appeals analyzed likelihood of success when reviewing a motion for stay pending appeal, the tests are identical. *Blackwell*, 388 F.3d at 552 (stating the "factors to be considered in determining whether an order should be stayed are the same factors considered in determining whether to issue a temporary restraining order [or] a preliminary injunction").

### A. Likelihood of success on the merits.

As mentioned, the issuance by the Forest Service and the Bureau of Land Management of a FONSI is reviewed under the Administrative Procedures Act. Thereunder, an agency's decision will not be overturned unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law, . . . [or] unsupported by substantial evidence."  5 U.S.C. § 706(2); *see Marsh*, 490 U.S. at 375; *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 439-40 (6th Cir. 2005).  The Ninth Circuit has noted that an EIS must be prepared under NEPA if "substantial questions are raised" about the effect of the project on environmental quality.  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149-50 (9th Cir. 1998) (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)).  "To trigger this requirement a plaintiff need not show that significant effects will in fact occur[;] raising substantial questions whether a project may have a significant effect is sufficient."  *Ibid.* (internal quotes and citation omitted).

The Council on Environmental Quality has issued regulations prescribing the considerations agencies must take into account when preforming EAs and determining that the proposed agency action would not "significantly affect[] the quality of the human environment," 42 U.S.C. § 4332(2)(C), so as to obviate the need for an EIS.  *See Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995) (noting that an EA was a "rough-cut, low-budget environmental impact statement [that] serves, among other things, to aid an agency's compliance with NEPA when no environmental impact statement is necessary [and] . . . is a highly significant 'first step' that determines whether the next step will or will not be the preparation of a fully polished, high-budget environmental impact statement") (internal quotes and citations omitted).  Neither party disputes that the project constitutes a "major Federal action" within the meaning of NEPA.  Rather, the dispute centers on the agencies' determination that the project does not "significantly" affect environmental quality.

The Federal Regulations direct agencies to consider both "context" and "intensity" when determining whether environmental quality will be "significantly" affected. *Ibid.* "Context" "means

-8-

that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."  40 C.F.R. § 1508.27(a).  "Intensity" "refers to the severity of impact." 40 C.F.R. § 1508.27(b).  Included among the ten specific considerations listed in the regulation are factors such as "[t]he degree to which the proposed action affects public health or safety;" "[u]nique characteristics of the geographic area such as proximity to . . . wild and scenic rivers, or ecologically critical areas[;]" [t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration[;]" and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(2), (3), (6), & (9).

The EA issued by the defendants addresses each of the categories in Rule 1508.27(a) & (b). However, the Court believes that the plaintiffs have raised substantial questions about the adverse environmental impact of the project that may undermine the defendants' findings and establish the lack of substantial evidence supporting its conclusions.  For instance, the plaintiffs argue that the project cite is near several unique geographic areas, including the Mason Tract (a state "Natural Area") and the South Branch of the Au Sable (a state "Natural River"), and is within a "semi-primitive non-motorized" area.  As a result, the project may cause significant impact to historical values of the Mason Tract and the Mason Chapel.  The site preparation will remove about 3.5 acres of old-growth trees.  AR at 157.

Further, the plaintiffs note that the project may significantly harm the aesthetic and recreational enjoyment of the affected public lands for hikers, fishermen, and other visitors (due to noise, odor, man-made structures, roads, traffic, and visual impacts) and may cause significant

impact to recreational visitors by causing them to reduce the number of visits they make to the nearby public lands, a point addressed in the EA only by the disputed claim that most visitors would not be able to hear, smell, or see the drilling site. The plaintiffs insist the project would not only impact individual visitors, but could impact the overall health of the local tourism economy.

Moreover, the plaintiffs offer evidence that the project may cause significant impacts to old-growth and other forest stands and the wildlife they harbor. The proposed well pad location is a clearing in old-growth designated forest of 3.5 acres. The plaintiffs state that the road improvements (widening road by two to four feet) and a portion of the flowline installation are also in designated old-growth as set forth in the Forest Plan.

The plaintiffs also point out that the project is within an area established for protection of the Kirtland's warbler, a bird that is on the endangered species list. AR at 133. According to the plaintiffs, the warbler's status "has become increasingly perilous since 1961. Its nesting population was 200 pairs in 1976, only 40 percent of the 502 pairs counted in 1961. The Au Sable watershed is the heart of the nesting range of this species." AR at 753. The Biological Assessment, the plaintiffs continue, notes that the project would cause an increase in cowbird habitat, which impacts the warbler by laying its eggs in the warbler's nests. AR at 156.

The declarations provided in support of the plaintiffs' motion tend to establish substantial questions going to the merits. Burton Barnes, a Professor of Forestry from the University of Michigan, stated:

> 3. I have reviewed the proposal to clear cut, denude, and clear with a bulldozer a 3.5 acre tract of old-growth Northern Hardwoods forest in the Huron-Manistee National Forests (HMNF) near the State's Mason old-growth tract. Some of the major ecological impacts to the specific area and the surrounding forest – even assuming drilling is not conducted subsequent to the clearing – are as follows:

-10-

a.      As noted above, there are relatively few areas of Northern Hardwoods old growth in the Old Growth Plan compared to other kinds of forest communities and ecosystems.  Thus a reduction of 3.5 acres is a considerable loss of approximately 120-year old growth in this community type compared to other much more widespread community types.

b.      The loss is more significant because the Old Growth Plan design is applied not to generalized community types, but to specific kinds of ecosystems, with different soil, topography, and vegetation conditions. Although there are many Northern Hardwood forest stands dominated by sugar maple, those designated as old growth on this specific ecosystem may be rare.  Not knowing the exact site-specific ecosystem in question I cannot say for sure the magnitude of the loss. But it could be substantial if this is a rare ecosystem and quite near the river.

c.      Regeneration following clear-cutting might be relatively rapid, and in 120 or more years from now a forest with a similar composition, structure, and function might be in place.  However, bulldozing the area poses great problems because all natural regeneration (that already existing on the area to form the next stand) would be eliminated.  Also the soil, microclimate, and light conditions for establishment of a new Northern Hardwoods stand would be greatly changed. Shade intolerant, sun-loving plants, raspberries or other "brush" are highly likely to invade and significantly delay the return of the Northern Hardwoods species by hundreds of years.

d.      If the bulldozing is severe and removes the topsoil down to sandy substrate, a scar might be left in the landscape for 500 years or more IF the desired regeneration on this particular site fails to become established.

e.      Gaps of this size in the forest will significantly effect the surrounding old-growth stand. In particular wind damage might be markedly increased depending on the topographic setting of the tract. In any event, the entire forest around the cleared land would be exposed for the invasion of unwanted tree, shrub, and herb species.

f.      Such a large gap (the normal gap would be that of one or two crown widths) would encourage the establishment of invasive species, including the spotted knapweed. Once gaining such a foothold in the opening, such species could  spread and cause problems to regeneration not only in the opening but in the  edges of the surrounding old-growth forest. Therefore, the affected area would be  significantly increased--and no longer "Old Growth Forest."

g.      Finally, erosion might be a problem depending on  the topography of the site or  more rapid release of nutrients into the nearby  river might be experienced.

4.  In summary, if drilling turns out to be permitted, the treatment planned is appropriate. However, only unwanted consequences, some of which are mentioned above, are likely to occur to the composition, structure, and function of this cleared area and the surrounding forest if the land is denuded and cleared but the drilling is not permitted.  It is reasonable because of significant ecological reasons that the

-11-

decision whether to drill be decided before such a drastic and possibly irreversible change is made in the landscape and the old-growth forest.

Pl.s' Mot. TRO, Barnes decl. at ¶¶ 3-4.  Charles Guenther, retired Wildlife Chief for the Michigan

Department of Natural Resources, stated:

4. It is significant that the area around the proposed drilling site is classified by the Forest Service as semi-primitive non-motorized.  It is also classified as an old growth area. By permitting site preparation and drilling in this area the quiet and peaceful aspects of the Mason Tract would be destroyed. Tremendous outdoor recreational opportunities exist for all the people of the state of Michigan from this historical quiet area.

5. Hunting opportunities are but one aspect of this recreational resource. Small game season runs from mid September through March.  Deer seasons come and go during this time.  In my professional opinion the proposed activities would alter wildlife patterns.  These disturbances would change travel patterns for hunting opportunities and certainly change predator-prey relationships. These would include bobcat, rabbit, grouse, coyotes and certainly white tailed deer. These proposed clearing and site preparations would create a irretrievable loss of hunting opportunity and certainly have a negative impact on the local economy, as hunters locate in other areas for these recreational activities.

6. Furthermore, management of this area in the past included blocking off trail access roads creating specifically wildlife habitat quiet areas. This area has become a historical yarding area for white tailed deer. As winter progresses deer retreat to small yarding areas for shelter and food. Deer can survive up to sixty days with very little food but yarding provides thermal cover, which is critical for survivability of young of the year deer.  Well site preparations will disturb these traditional activities.

7. In addition to the loss of hunting opportunities and the loss of habitat, the Mason tract area hosts some eleven miles of hiking trail from end to end.  This is also used as a cross-country ski trail in the winter. Cross-country skiing is a major winter activity in this area and is also a very quiet sport. Skiers come for the pristine quality and quiet of the Mason Tract and will not tolerate the noise and upset of site preparation and drilling. They too will suffer irretrievable loss of days of recreational opportunities.

8. It is significant that the area in close proximity to the proposed production site is an area reserved for the endangered Kirtland's Warbler.  To permit site preparation, drilling and production in this area would undoubtedly be detrimental to the Kirtland Warbler habitat.

-12-

Pl.s' Mot. TRO, Guenther decl. at ¶¶ 4-8

Based on the above evidence, the plaintiffs have demonstrated a substantial question whether the defendants' finding that the project would cause no significant environmental impact is arbitrary and capricious.  In terms of context, there is evidence that the project and site preparation could affect more than just the immediate local area, as contended in the FONSI.  In terms of intensity, the plaintiffs have identified species of birds – at least one endangered – and other animals that could be affected with respect to habitat, and the loss of old-growth forest that may occur.  Clearing of the land for site preparation could cause invasive species to establish themselves.  As a result, the northern hardwoods and portions of the old-growth could take hundreds of years to regenerate.

Further, there is evidence that tourism may be disrupted.  The area surrounding the project is classified in part as non-motorized and semi-primitive, and site preparation may include the expansion of roads and an increase in traffic.  Bulldozing that may occur during the site preparation phase could remove topsoil to the sandy substrate and leave a 500 year "scar."

As noted, the plaintiffs must demonstrate success on the merits to a degree inversely proportional to the level of harm.  *Family Trust Foundation of Kentucky, Inc.*, 388 F.3d at 227.  The level of harm, at least as suggested by the papers at this stage of the litigation, is substantial.  Moreover, the plaintiffs have met the burden of establishing at least a substantial question on the merits.  The FONSI addresses some concerns of potential environmental impact but makes no meaningful analysis of the habitat destruction that may occur beyond the confines of the project area, such as the habitat of the warbler, the northern hardwoods, and the old-growth forest.

The FONSI asserts that no endangered species will be threatened.  However, there is evidence that the warbler, an endangered species, could be affected as suggested by the declaration

of Charles Guenther.  There is no indication in the FONSI whether road improvements will change the unique characteristics of the geographical area.  Moreover, there is no mention of invasive species that might result from the site preparation and later drilling that could prevent restoration of the land by hundreds of years.  Finally, there seems to be no commentary on the effect on topsoil the  clearing and logging for site preparation may cause.  There are substantial questions going the merits of whether an EIS should have been prepared.

The defendants argue that the plaintiffs have not presented evidence that the Forest Service's actions were arbitrary and capricious.  That conclusion, however, is belied by the declarations and other evidence presented above that suggest significant environmental impact.  *See Idaho Sporting Congress*, 14 F.3d at 1332 (stating that to trigger and EIS the "plaintiff need not show that significant effects will in fact occur," raising "substantial questions whether a project may have a significant effect" is sufficient).

The plaintiffs also argue that NEPA was violated because the EA did not fully consider other alternatives.  In essence, the plaintiffs believed that the Forest Service considered only two options: the alternative of no action and the proposed project.  There was a third option, the one actually selected, but that alternative was a modification of the of the original proposal and not a true alternative, according to the plaintiffs.  "A properly drafted EA must include a discussion of appropriate alternatives to the proposed project." *Davis v. Mineta*, 302 F.3d 1104, 1120 (10th Cir. 2002).

According to the EA, the project was intended "to foster and encourage the orderly exploration and development of the nation's mineral resources." Pl.s' Mot. TRO Ex. B, Environmental Assessment at 3.  The plaintiffs state that they presented specific alternatives that

-14-

would use an existing site with gas and oil facilities, is presently adjacent to a public road, and would increase drilling distance less than fifteen percent. They contend that the Forest Service's only explanation is that a well head cannot be moved because angles are to great for drilling safety. The Forest Service did not, however, consider alternative locations for the bottom hole or present reasons for not doing do so.

On the present record, it is difficult to assess whether the Forest Service acted in good faith in considering the three options actually reviewed. The plaintiffs statements, if believed, could present a substantial question whether these alternatives properly were rejected as futile.

The plaintiffs next claim that NEPA was violated because the Forest Service improperly segmented the project for purposes of assessing environmental harm. Courts have developed an impermissible segmentation rule in NEPA jurisprudence. That rule provides:

> Impermissible segmentation involves a "major federal action" where a small part of that action has been "segmented" in order to escape application of the NEPA process. The hallmark of improper segmentation is the existence of two proposed actions where the proposed component action has little or no independent utility and its completion may force the larger or related project to go forward notwithstanding the environmental consequences. *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986); *Bragg v. Robertson*, 54 F. Supp.2 d 635, 649 (S.D. W.Va. 1999). Courts have also required that environmental effects of multiple projects be analyzed together when those projects will have a cumulative effect on a given region. *Kleppe*, 427 U.S. at 410; *Andrus*, 825 F. Supp. at 1501. Finally, multiple stages of a development must be analyzed together when "the dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985).

*Hirt v. Richardson*, 127 F. Supp. 2d 833, 841-42 (W.D. Mich. 1999).

In the present case, if the project is successful, Savoy may seek a permit for an additional three wells in the region. However, the project as proposed is for only one well. At present, it is speculative whether the project will yield results. Further, if successful, the additional wells would

-15-

trigger NEPA as part of the application process.  Moreover, there is independent utility of the initial well.  Finally, the Sixth Circuit has explained that NEPA "speaks solely in terms of Proposed actions; it does not require an agency to consider the possible environmental impacts of less imminent actions." *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434 (6th Cir. 2005).  Here, the additional wells likely are not presently proposed actions or imminent.  The plaintiffs could prevail, but the Court does not conclude that this aspect of the complaint presents a substantial question.  Nonetheless, when considering the plaintiffs' principal arguments, the Court believes that the likelihood-of-success-on-the-merits factor favors issuance of a preliminary injunction.

### B.  Irreparable harm.

In *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531 (1987)*,* the Supreme Court explained the unique nature of irreparable injury inquiry  presented in an environmental case:

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Id.* at 545.  Stated otherwise, "[i]n the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action. . . . [T]he presence of strong NEPA claims gives rise to more liberal standards for granting an injunction. If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 643 (9th Cir. 2004) (citations omitted).

The plaintiffs have submitted declarations in support of their motion that establish the nature of the impact on the environment of the project and, in the Court's view, advocate a strong case of irreparable injury.  For example, former Department of Natural Resources official Guenther averred

-16-

that site preparation and drilling would destroy the quiet and peaceful aspects of the Mason Tract; wildlife patterns would be altered; predator-prey relationships would be changed with effects on bobcat, rabbit, grouse, coyotes and white tailed deer; white-tail deer habitat would be disturbed; recreational opportunities would be lost; and the habitat of the endangered Kirtland's Warbler would be jeopardized. Guenther decl. at ¶¶ 1-8.

In addition, Professor Barnes, after summarizing his findings quoted above, concluded that "unwanted consequences . . . are likely to occur to the composition, structure, and function of this cleared area and the surrounding forest if the land is denuded and cleared but the drilling is not permitted." Barnes decl. at ¶¶ 2-4. Professor Barnes specifically referred to the loss of 120-year-old rare hardwood forestation, the disruption of natural regeneration systems, the facilitation of invasive species, damage caused by bulldozing, and erosion of the topography.

The plaintiffs also cite several comments to the EA that were received by the defendants, which suggest irreparable injury:

> The Michigan Environmental Council noted that even the three and a half initial acres of clearing would cause irreparable harm because of impacts to recreation. Ex. P.
>
> The Michigan Department of Natural Resources expressed concern regarding visual impacts from the four-acre well pad site and expressed surprise that work was proposed within the old-growth area. Ex. P. Commenting on the EA, DNR noted that noise impacts from the new road and increased use of the road would be the most significant impacts. Ex. O.
>
> The County of Crawford expressed concern that the noise and other impacts could negatively affect tourism. Ex. O, P.
>
> Several state and federal senators and representatives expressed concern regarding impacts to the environment and tourism and the effect on the recreational experience from the noise and odor. Ex. O., P. (The Forest Service economist "suggested we interview people (business owners and visitors in the area) to see what the effect of drilling a well would have on tourism." Ex. H (AR 78). There is no evidence this

-17-

occurred, other than the outpouring of comment letters which state there will be such an impact).

Michigan Governor Jennifer Granholm was concerned regarding the proximity to the Mason Tract and the impact that could have on the recreational experience. Ex. P.

United States Senator Debbie Stabenow urged defendants to prepare a full EIS, expressing concerns over impacts to the Mason Tract area. Ex. O.

Michigan Trout Unlimited expressed concerns about impacts from noise. Id.

One commenter who is over 75 years old and has enjoyed the area for decades stated that his granddad knew Mr. Mason and that in his opinion even the slamming of an outhouse door would disturb the natural qualities of the area. Id.

A biology professor expressed concerned about impacts to his students' research, especially with regards to noise from the facility becoming the dominant sound. Id.

When the lease was first issued, the state Department of Natural Resources commented: Placement of wells, pipelines, and related facilities along this road as required in a semiprimitive area will negatively impact the current feeling of traveling through a pristine wilderness area. Such development may have immense visual impact along the entrance road into the Mason Tract. . . . I . . . recommend the road be maintained in its current condition to allow public access to the east side of the Mason Tract and to the Chapel.

AR at 1257-58. At this stage of the litigation, taken together, the evidence suggests that irreparable injury likely will occur if site preparation begins and drilling is permitted. This factor, therefore, favors the issuance of a preliminary injunction.

The defendants argue that the evidence of harm to the environment and to the plaintiffs is speculative at best and would be diminished by the passage of time and existing environmental standards. However, even accepting this statement as true, the defendants fail to speak directly to the declarations provided by the plaintiffs and more importantly make no mention of the harm that may result from the site preparation, which likely will be substantial.

-18-

C.  Substantial harm to others.

The defendants in this case argue that harm will result to them and Savoy Energy because an injunction will delay operations, and the Michigan Department of Environmental Quality and the Forest Service have required Savoy to complete its exploratory drilling between December 2005 and April 2006.  Apparently, the Forest Service has "determined that even an injunction that prevents Savoy from completing its exploratory drilling . . . could both frustrate its statutory mandates to regulate Savoy's federal leases." Defs' Resp Br. at 14.  However, the Court's task is to evaluate the alleged harm and balance the parties' interests: "a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, shown serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued."  *Six Clinics Holding Corp.*, 119 F.3d at 399-400 (internal quotes and alterations omitted); *see also Baker v. Adams County/Ohio Valley School Board*, 310 F.3d 927, 930 (6th Cir. 2002) (noting that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended" in compliance with an injunction "are not enough [to preclude issuance]").

Loss of anticipated revenues generally does not constitute harm to others affected by injunctions in environmental cases.  *Nat'l Parks Conservation Assoc. v.  Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (reasoning that "loss of anticipated revenues does not outweigh potential irreparable injury to the environment);  *Idaho Sporting Congress*, 333 F.3d at 562 (stating that although an injunction "could present a financial hardship to the Forest Service . . . this possible financial hardship is outweighed by the fact that the old growth forests plaintiffs seek to protect would, if cut,

-19-

take hundreds of years to reproduce"); *Seattle Audubon Society v. Evans*, F. Supp. 1081, 1096 (W.D. Wash. 1991) (reasoning that "[t]he mightiest economy on earth" can afford a temporary stay to ensure the Forest Service properly analyzes and discloses environmental impacts).  Similarly, the Tenth Circuit has concluded that "[a]ny increased cost from delay . . . is not sufficient to establish prejudice because NEPA contemplates just such a delay." *Reservation Coalition v. Pierce*, 667 F.2d 851, 855 (10th Cir. 1982)

The harm to others that could result from a preliminary injunction to preserve the status quo while the merits of the plaintiffs' complaint are addressed would be a delay of one year to Savoy and, perhaps, a potential compromise of state leases for the exploratory well.  The defendants have not articulated why this harm is substantial.  They do not state the effect of breaching a state lease or whether the regulations they have promulgated along with the Department of Environmental Quality do not permit a variance or alternative relief.  The minerals Savoy seeks to explore and extract have been in place for thousands of years; a delay while this action pends appears insignificant when viewed in that context.

### D.  The public interest.

Finally, there is a strong public interest in preserving national forests in their natural states and ensuring that the dictates of NEPA are complied with. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1125 (9th Cir. 2002).

### III.

The Court has evaluated all the factors bearing on the issuance of a preliminary injunction and concludes that the balance favors issuance so that the proposed project not proceed until the merits of the plaintiffs' complaint are addressed.  The Administrative Procedures Act allows judicial

review of the determination by a federal agency that no significant environmental impact will result

from a proposed project.  Allowing the project to proceed in light of the substantial challenge lodged

by the plaintiffs would preclude any effective right to judicial review.

Ths issuance of the injunction in this case serves to preserve the *status quo* during the review

of the action of the agencies.  The defendants have not offered any evidence or averments of

financial burdens that would be caused by a preliminary injunction, and therefore the Court does not

find that a bond is required.

Accordingly, it is **ORDERED** that the plaintiffs' motion for a preliminary injunction [dkt

# 14] is **GRANTED.**

It is further **ORDERED** that the matter is recommitted to the magistrate judge for further

pretrial proceedings.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: December 8, 2005

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 8, 2005.

s/Tracy A. Jacobs
TRACY A. JACOBS