**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**


ANGLERS OF THE AuSABLE;
TIM MASON; and SIERRA CLUB,
(Mackinac Chapter),

       Plaintiffs,                           CASE NO.  05-CV-10152-BC

v.                                    DISTRICT JUDGE DAVID M. LAWSON
                                       MAGISTRATE JUDGE CHARLES BINDER

UNITED STATES FOREST SERVICE
and U.S. BUREAU OF LAND
MANAGEMENT,

       Defendants.
_____/


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
**ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
(Dkt. 30)
**AND**
**DEFENDANTS' CONSOLIDATED MOTION FOR SUMMARY JUDGMENT**
(Dkt. 34)


**I.**      **RECOMMENDATION**

For the reasons set forth below, **IT IS RECOMMENDED** that:

1.      Plaintiffs' Motion for Summary Judgment be **GRANTED**;

2.      Defendants' Consolidated Motion for Summary Judgment be **DENIED**;

3.      the Decision Notice and Finding of No Significant Impact for the U.S.A. & State
South Branch 1-8 Well Project be declared **INADEQUATE**;

4.      the Defendants be **ENJOINED** from using the Decision Notice and Finding of No
Significant Impact for the U.S.A. & State South Branch 1-8 Well Project; and

5.      the matter be **REMANDED** to the Defendants for further proceedings.

## II.  REPORT

### A.  Introduction

Plaintiffs commenced this action on June 8, 2005, by filing a complaint for declaratory and injunctive relief.  (Dkt. 1.)  An amended complaint followed three months later.  (Dkt. 5.) Plaintiffs seek to enjoin Defendants from allowing exploratory oil and gas drilling to take place in a parcel within the Huron-Manistee National Forest.  Upon learning that initial site preparation for this project was to begin imminently, on December 2, 2005, Plaintiffs filed a motion for temporary restraining order and preliminary injunction. (Dkt. 14.)  After the filing of a response (Dkt. 26) and a hearing, on December 7, 2005, United States District Judge David Lawson granted the motion and entered a preliminary injunction.  (Dkts. 28, 29; *see also Anglers of AuSable v. U.S. Forest Servs.*, 402 F. Supp. 2d 826 (E.D. Mich. 2005)).

This same opinion recommitted the matter to this judicial officer for further pretrial proceedings. (Dkt. 29.) The instant motions followed.  Defendants consolidated their motion with a response opposing Plaintiff's motion (Dkt. 34), and Plaintiff filed a response opposing Defendants' Motion (Dkt. 35.)  Defendants filed a reply (Dkt. 38), and oral argument was heard on March 21, 2006.  The parties were given two weeks for the filing of supplemental briefs and exhibits.  (Dkt. 41.)  Both parties filed supplemental briefs on April 4, 2006, (Dkts. 42, 43), and at the Court's request, Defendants submitted a complete version of the Huron-Manistee Forest Plan.  Accordingly, the motions are now ready for Report and Recommendation.

### B.  Facts

In 2001 the Forest Service determined that there was no significant environmental impact to the leasing of sub-surface federal oil, gas and mineral rights on 9,500 acres of the Huron-

Manistee National Forest.  (Pl.'s Mot., Dkt. 30, Ex. N;[1] Ex. B at 66; AR[2] at 1119-23.)  Savoy Energy, L.P. ("Savoy") obtained 6 leases covering approximately 640 acres within the Forest. (Dkt. 30, Ex. B at 5.)  Subsequently, on May 5, 2003, Savoy filed with Defendants an application to drill a gas well on one of the parcels to which it was granted a mineral lease.  (*Id.* at 8.) Meetings and field inspections followed, and public comment was solicited.  (*Id.* at 8-9.) Numerous concerns were raised by members of the public (*Id.* at 9), and in September 2003, after more public meetings and the consideration of alternative drilling locations, Savoy filed a new application with the Defendants.  (*Id.*)  Defendants requested additional information, and in apparent response, on October 16, 2003, Savoy filed a new application to drill a gas well on a parcel known as U.S.A. & State South Branch 1-8.  (*Id.*, Ex. D.)  This latest application requested permission to develop a well site encompassing approximately 3.5 acres which would be cleared, graded and leveled, as well as the preparation of a production facility located approximately 1.1 miles east of the well, and the construction of a pipeline connecting the two facilities which would run beside existing forest service roads connecting the two sites.  (*Id.*)  Savoy proposed to drill using a technique called "directional drilling" with the target (bottom hole) being a point approximately 2200 feet northwest of the surface drilling site.  (*Id.*, Ex. B at 20.)

Employees of Defendants thereafter undertook consideration of the application.   Based upon Savoy's responses to a questionnaire and telephone conversations with Savoy employees, in mid-July 2004, a Forest Service employee prepared a document entitled "Foreseeable Development."  (Dkt. 30, Ex. I.)  That document notes that up to three additional wells, each of

---

[1] In their motions, both parties denominated exhibits using letters.  All references to letter exhibits will also include a reference to the pleading to which they are attached.

[2] (AR) denominates the Administrative Record upon which Plaintiffs base their complaint.  Citations to the Administrative Record will be included where available.

3

which would require a 3.5 acre well pad, could be developed.  The construction of additional access roads, as well as the upgrading of roads, could require the clearing of an additional 3.5 acres.  (*Id.*)  The construction of new pipelines, which would not follow existing roads, would require the clearing of an additional two acres.  (*Id.*)

In August 2004, the Forest Service issued an "Environmental Assessment"[3] and a "Biological Assessment."  (Dkt. 30, Exs. B & C.)  These documents describe additional details of the project requested by Savoy.  According to summaries in these documents, two Forest Service roads, numbered 4208 and 4209 would be plowed to allow year-round access to the well site.  (*Id.*, Ex. B at 21.)  A 20-foot wide section of new road, 50 feet in length, comprising approximately .05 acres, would be cut to provide access to the drilling site.  A water well would also be drilled at the well site.  (*Id.*)  The production facility would require the clearing of approximately two acres and the installation of separators, tanks, a dehydrator, a compressor, and monitoring equipment.  (*Id.*)  A flow line would be installed connecting the two sites and would require the burying of approximately 1.7 miles of pipeline between the two facilities.  (*Id.*)  The Biological Assessment points out that the Forest Service roads linking these facilities would be crowned and sloped for drainage and would be widened up to 14 feet in width.  (*Id.*, Ex. C. at 12.)  An additional three feet of clearing would be done on either side of the road, and  total width would not exceed 20 feet.  (*Id.*)  Construction of the well pad and the short access road was expected to take approximately four days.  (*Id.*, Ex. B at 1.)  The well was expected to take approximately 45 days to drill, and "[i]f the well is productive, the additional construction would continue immediately after the well is

---

[3]In its briefing, the Government cites to the copy of this document which appears as an exhibit to the Government's Opposition to Plaintiffs' Motion for Temporary Restraining Order (Dkt. 26, Ex. A).  For convenience, this Report and Recommendation cites to the copy of this document contained in Plaintiffs' Motion for Summary Judgment.

completed." (*Id.*)  The laying of the pipeline and construction of the production facilities were expected to take a total of approximately four weeks.  (*Id.*)

In addition to considering the Savoy project as requested, both assessments also consider two other alternative outcomes for this project.  The first is  labeled "Do Not Permit."  (*Id.*, Ex. B at 20; Ex. C at 5.)  The other alternative considered in each assessment is a "Modified Proposed Action with Conditions of Approval."  (*Id.*, Ex. B at 26; Ex. C at 6.)  An Appendix to the Environmental Plan points out that if Savoy's project is approved, and is successful, "federal royalty revenue from the resulting production would be distributed to the federal treasury and the state/local county."  (*Id.*, Ex. B at 69.)

In considering the alternatives identified, employees of the Defendants noted in the Assessments that the drilling site proposed by Savoy was environmentally sensitive in a number of respects.  The drilling site was within the "south branch SPNM."[4]  This is one of two such areas in the Mio Ranger District of the Forest.  (*Id.*, Ex. C at 5.)   Using a system called "recreation opportunity spectrum" ("ROS"), the SPNM has been given by the Forest Service a Management Prescription Area ("MPA") of 6.1.  Such areas are to be characterized by "few and/or subtle human modifications and with a large probability of isolation from sights and sounds of others."  (*Id.*, Ex. B at 33.)  Much of the area between the drilling site and the production site is characterized by MPA 4.5, known as "roaded natural."  (*Id.*)  In such areas, "characterized by a predominately natural environment . . . Evidence of the sights and sounds of humans is moderate, but in harmony with the natural environment.  Opportunities exist for both social interaction and moderate isolation form [sic] the sights and sounds of humans."  (*Id.*)

---

[4]Semi-Primitive Non-Motorized area.

5

All of this area is also designated by the "Forest Plan" for the Huron-Manistee National Forest[5] as "old growth" forest. "Old growth" forest is to "be managed primarily by allowing natural processes to occur." (Forest Plan at IV-36.) According to the Forest Plan, "[g]enerally new motorized trails will not be constructed in old growth." (*Id*. at IV-40.) Roads and trails are to "use minimum opening width necessary to allow safe passage and meet design criteria." (*Id*. at IV-37.) In addition, the Forest Plan states that "[w]here there are reasonable alternatives, surface-disturbing activities will take place outside of old growth." (*Id*. at IV-73.)

The Assessments also note that the proposed drilling site was adjacent to the boundary of an area called "the Mason Tract." This parcel, comprising approximately 4700 acres, was deeded to the state of Michigan by George W. Mason, who conditioned his gift upon the state's promise to keep it in a "natural state" and not to sell it. (Dkt. 30, Ex. B at 33; *see also* AR at 1257.) The deed requires the state to keep the tract "a wilderness, with aesthetic values being given major consideration." (*Id*.) The only structures on the tract are a campground and a log chapel. (AR at 748.) The Mason Tract has been designated as a "natural area" by the state. The proposed drilling site is approximately 800 feet (.3 mile) from the Mason Tract boundary. (Dkt. 30, Ex. A at 13.) The proposed "bottom hole" is within the Mason Tract. (*Id*., Ex. B at 22.) The proposed pipeline connecting the drilling site to the production facility would run along the only road to the Mason Tract chapel. (*Id.* at 13.)

Running through the Mason Tract is the South Branch of the Ausable River, which is widely known for its quality of trout fishing and has been designated by the state of Michigan as a "natural river." (AR at 756.) The river "is moderately to heavily used by anglers and is a

---

[5]Pursuant to the Court's request during oral argument, Defendants filed a complete copy of the Huron-Manistee National Forest Plan (hereafter "Forest Plan"). (Dkt. 50.)

popular stretch for canoeing." (Dkt. 30, Ex. B at 34.)  The proposed drilling site is 2900 feet (.55 miles) from this river.  (*Id*., Ex. A at 10.)

The Savoy project sites are also within the protected management areas of the Kirtland's warbler, a federally designated "endangered species," and the Bald Eagle, a federally designated "threatened species."  (*Id*., Ex. C at 3, 15.)  The Kirtland's warbler is a small bluish-gray song bird and was one of the first species listed under the Endangered Species Act of 1973.[6]  (*Id*., Ex. Q at 1, 3.)  This bird has a series of unique reproduction traits and very specific nesting habitat which have effectively limited its overall population.  (*Id*.)  In addition, a blackbird species, known as the "cowbird" is a "nest or brood parasite" of the warbler.  Instead of building their own nests, cowbirds lay their eggs in warbler nests, and because the cowbird hatchlings are significantly larger than the young of the Kirtland's warbler, they displace the warbler and consume its food.  Prior to active efforts to control cowbirds, about 70% of warbler nests were being parasitized by cowbirds.  (*Id*.)  As pointed out by the Plaintiffs and noted by Judge Lawson, the warbler's status "has become increasingly perilous since 1961.  Its nesting population was 200 pairs in 1976, only 40 percent of the 502 pairs counted in 1961.  The Au Sable watershed is the heart of the nesting range of this species."  (AR at 753.)  *Anglers*, 402 F. Supp. 2d at 833.  The Huron-Manistee National Forest Plan mandates that the endangered species "management will take precedent over

---

[6]This document is entitled "Kirtland's Warbler Fact Sheet" and is attached to a declaration made by one of Plaintiffs' counsel.  This fact sheet is publicly available and was printed by counsel from the U.S. Fish and Wildlife Service internet site.  *See* http://www.fws.gov/midwest/Endangered/birds/Kirtland/kiwa-facts.htm.  Although Defendants argue persuasively that at least three declarations attached to Plaintiffs' motion are not included in the administrative record and that under the legal standards set forth above should not be considered by the Court, I am unable to conclude that a factual summary prepared by one of the Defendants and publicly available on the internet should be similarly considered beyond the purview of this Court's consideration.  *See U.S. v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1427-28 (6th Cir. 1991)("a reviewing court evaluating agency action on the administrative record may consider additional evidence as either background information to aid the court's understanding, or to determine if the agency examined all relevant factors or adequately explained its decision.")

old growth goals and standards and guidelines." (Forest Plan at IV-58.) This mandate appears particularly appropriate since the Forest Plan also notes that in this century, "the bird's population declined dramatically" (*id*. at III-18-19) and that more research is needed on the bird's post-fledgling habitat requirements. (*Id.*)

This area has also been generally designated as MPA 4.5 in the Forest Plan, entitled "Kirtland's Warbler." One of the prime purposes of management activities in this area is to "maintain and develop essential nesting habitat for the Kirtland's warbler." (*Id*. at IV-174.) A map in the Biological Assessment indicates that a portion of the pipeline route connecting the well site and the production facility would border or cut through "Kirtland Warbler Essential Habitat." (Dkt. 30, Ex. C at 14-15; AR at 132-133.) The importance of Kirtland's warbler management is further shown by the fact that this matter is the subject of a separate plan entitled "Kirtland's Warbler Recovery and Management Plan." (*Id*. at III-14.)

After undertaking and completing the public notice and public comment process provided for the applicable regulations, on January 27, 2005, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("FONSI")[7] for the U.S.A. & State South Branch 1-8 Well Project.[8] This document is authored by Leanne M. Martin, Forest Supervisor, and begins with a statement that Ms. Martin has "decided to implement Alternative 2." (Dkt. 30, Ex. A at 1.) After summarizing the alternatives considered, as well as Savoy's proposal, Ms. Martin states that the approval of Alternative 2, with "*additional* conditions for mitigation" (*id*. at 5, emphasis in original), was based upon three primary criteria. (*Id*., Ex. A at 5.) The FONSI states that Ms.

---

[7]See footnote 3 above. This document appears as Exhibit B to the Government's Opposition to the Plaintiffs' Motion for Temporary Restraining Order.

[8]This document appears as Exhibit A to Plaintiffs' Motion for Summary Judgment (Dkt. 30) and as Ex. B to Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. (Dkt. 26.)

Martin's decision was consistent with the Forest Plan's goals, objectives and standards. Ms. Martin then states that as a result of public comment, "I took a hard look at the issues and how they were addressed in each Alternative. In a number of cases, public and agency comments helped me identify a reasonable range of alternatives and necessary mitigation requirements. Overall, public comments provided me the necessary framework to base my decision." (*Id*.) The third consideration identified by Ms. Martin was that Savoy's proposal was compatible "with other agency and American Indian tribe goals[.]" (*Id*.) Ms. Martin states that she consulted with the Bureau of Land Management, the Michigan Department of Natural Resources and the Michigan Department of Environmental Quality.

With regard to the first consideration cited in the FONSI, Ms. Martin states that she "determined that it was inappropriate to select Alternative 1, no action, for implementation since it does not respond to the Need for Action and overall would not move toward achieving Forest Plan goals and objectives." (*Id*. at 6.) As to the environmental issues identified through public comment, she states that she "determined that the original Proposed Action did not include the additional conditions in mitigation measures to address the issue and concerns to the extent desirable and therefore it would be inappropriate to move forward with the implementation of the original Proposed Action." (*Id*. at 8.) With regard to the third criterion she identified, Ms. Martin states that "Alternative 2 was specifically designed to include mitigation measures to meet concerns raised by the Michigan Department of Natural Resources." (*Id*. at 9.) Ms. Martin states that the U.S. Fish and Wildlife Service was consulted and concurred with a "no effect" determination as to endangered species under Alternative 2.[9] (*Id*.; *see also* Dkt. 27, Ex. G.) Plaintiffs filed the instant suit approximately six months later.

---

[9]Unless otherwise indicated, all references to proposed action are to Alternative 2.

**C.      Governing Law**

**1.      National Environmental Policy Act ("NEPA")**

NEPA sets forth a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States.  42 U.S.C. § 4321.  "NEPA itself does not mandate particular results" in order to accomplish these ends.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989).  Rather, NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.  *See id.* at 349-50.

NEPA requires that:

> federal agencies "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(2)(C). This detailed statement is called an Environmental Impact Statement ("EIS").

*Buckeye Forest Council v. U. S. Forest Servs.*, 378 F. Supp. 2d 835 (S.D. Ohio, 2005) (emphasis added).

**2.      Counsel on Environmental Quality ("CEQ") Regulations**

The CEQ has promulgated regulations to establish uniform procedures for determining whether, when, and how to prepare an EIS (Environmental Impact Statement).  *See* 42 U.S.C. §§ 4341-47 (establishing the CEQ); *see also* 40 C.F.R. §§ 1500-17.  When a proposed action is

neither one normally requiring an environmental impact statement nor one categorically excluded from the EIS process, the agency must prepare an Environmental Assessment ("EA"). NEPA makes no mention of Environmental Assessments; however, the CEQ regulations outline the requirements for preparing an EA. 40 C.F.R. § 1500 *et seq*. The Supreme Court has stated that these regulations are entitled to "substantial deference." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 372, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989).

An EA has been described as a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement – which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project – is necessary." *Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998) (quoting *Cronin v. United States Dep't of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990)). "[T]he purpose of an environmental assessment is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement." *River Road Alliance, Inc. v. Corps of Engineers of Untied States Army*, 764 F.2d 445, 449 (7th Cir. 1985). As described by the Sixth Circuit:

> If an agency is unsure as to whether a project would significantly affect the quality of the human environment, an agency may postpone the preparation of an EIS and prepare an Environmental Assessment (an "EA"), which briefly provides sufficient evidence and analysis for determining whether there is a significant environmental impact. 40 C.F.R. § 1508.9. After analyzing the EA, the agency decides whether to prepare an EIS or issue a finding of no significant impact. 40 C.F.R. § 1501.4(e); 40 C.F.R. § 1508.13. A FONSI briefly presents the reasons why an agency action will not create a significant environmental impact and why an EIS will not be issued. 40 C.F.R. § 1508.13. (citation omitted.)

*Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta,* 375 F.3d 412, 414 (6th Cir. 2004).

The CEQ regulations require that in determining whether the "major federal action" "significantly" affects the environment, consideration be given to the following factors:

(a) Context.  This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality.  Significance varies with the setting of the proposed action.  For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.  Both short- and long-term effects are relevant.

(b) Intensity.  This refers to the severity of impact.  Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action.  The following should be considered in evaluating intensity.

(1) Impacts that may be both beneficial and adverse.  A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
. . . .
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts . . .
. . . .
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

40 C.F.R. § 1508.27.

A number of practical consequences arise from the decision not to proceed with an Environmental Impact Statement.  One of them is that the federal action will not be reviewed by the EPA itself.  40 C.F.R. §§ 1506.9, 1506.10.  Thus, it has been held that "if substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared."  *Foundation for North American Wild Sheep v. U.S. Dept. of Agriculture*, 681

F.2d 1172, 1177-78 (9th Cir.1982) (citations omitted), *quoted in House v. U.S. Forest Service, U.S. Dept. of Agriculture,* 974 F. Supp. 1022, 1035 (E.D. Ky. 1997).

### 3.     Administrative Procedures Act ("APA")

NEPA provides for no private right of action. As a result, Plaintiffs bring their claims under the APA. The standard of review under the APA is limited to determining whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Marsh*, 490 U.S. at 376. The focal point for review is the administrative record already in existence rather than a new record made before the reviewing court. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985). The party challenging an agency's actions under the APA bears the burden of showing that the agency's actions were arbitrary and capricious or otherwise not in accordance with law. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

To determine whether an agency action is arbitrary or capricious, a reviewing court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Marsh*, 490 U.S. at 378 (citations omitted). The court must satisfy itself that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference. *Marsh*, 490 U.S. at 376; *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1330 (9th Cir. 1992). Pursuant to this deferential standard, reviewing courts should not substitute their judgments for those of an agency as to the

13

environmental consequences of its actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S. Ct. 2718, 49 L. Ed. 2d 576 (1976).

**D.      Arguments of the Parties**

Plaintiffs argue that the Defendants' approval of this project, through the filing of a FONSI, and the Defendants' concomitant failure to undertake and complete a full environmental impact statement violates the applicable statutes and regulatory provisions governing the review and consideration of the environmental impact of projects undertaken on federal lands.

Emphasizing the deferential standard of review embodied in the APA, Defendants argue that in every respect the actions taken in review of the Savoy application comport with the statutory mandates governing the management of the Huron-Manistee National Forest.  During oral argument, counsel for Defendants readily agreed that the environmentally sensitive areas require special consideration and vigorously maintained that this level of consideration was accorded Savoy's proposed project.

**1.      Environmental Assessment ("EA")**

**a.      Overview and Visual Quality**

The Environmental Assessment considered the potential effects of Savoy's proposed project upon the SPNM, old growth forest, the Mason Tract and the South Branch of the Au Sable River, primarily in terms of visual quality (including the cutting of trees and alterations to roads), odor, and noise.  As to the visual quality, the EA points out that two to three thousand people per year travel Forest Service Road 4209, which leads to the Mason Tract Chapel.  (Dkt. 30, Ex. B at 37.)  As proposed by Savoy and noted earlier, the pipeline connecting the drilling site and the production facility would run along this road.  Using the official sensitivity criteria set forth in the Forest Plan, the EA notes that Forest Service Road 4209 has a sensitivity level of 1, the highest

14

level of sensitivity. According to the EA, this area has also been given a Visual Quality Objective (VQO) of "retention" which "means that management activities are not evident to the casual forest visitor." (*Id*.) The EA describes the current landscape as "forested with a few openings[,]" and states that most recreationists who visit the Mason Chapel, fish the AuSable River or visit the SPNM area, have an expectation of viewing an undisturbed natural landscape (*Id*.)

According to the EA, Savoy would have to remove approximately 20 larger trees for the passage of heavy equipment to the drilling site, along with clearing an area adjacent to about one mile of the road for placement of the pipeline connecting the drilling site to the production facility. (*Id*.) The EA concedes that the construction activities as proposed by Savoy for this area "would not meet the VQO of retention. Eventually (5 to 10 years) after the slash decomposed and the stumps weathered the VQO of retention would be met." (*Id*. at 37-38.) The EA further concedes that there would be an increase in traffic which could impact the recreational experience of those visiting the SPNM. (*Id*. at 38.) The EA then concludes that with the additional mitigation efforts identified in Alternative 2, such as the placement of stumps out of view and the chipping and scattering of smaller cuttings (slash), so that they lie within 12 inches of the ground, "[a]fter one complete growing season, it is expected that the VQO of retention would be met. After one growing season, these activities would not be evident to the casual forest visitor." (*Id*.)

Forest Service Road 4208 is a narrow road which is a spur from Forest Service Road 4209. (*Id*. at 39.) This road leads directly past the proposed drilling site and dead ends approximately one-half mile to the west, in the vicinity of the east bank of the South Branch of the AuSable River. (*Id*. at 36.) This road also has been given sensitivity class 1 and a VQO of "retention." (*Id*. at 39.) The EA describes this area as "largely flat and forested," and notes that approximately one thousand visitors per year use this road. (*Id*.) The EA estimates that approximately ten large trees

15

along this road would be removed so that drilling equipment could travel the road, and that a strip of ground vegetation approximately adjacent to the road would be removed to place the pipeline to the production facilities. (*Id*.) Noting that the drilling site is only about 50 feet from this road, the EA concedes that Savoy's proposed activities, along with the clearing of approximately 3.5 acres close to the road, would not meet the sensitivity 1 visual quality standards for 20 to 30 years. (*Id*.) Even if the well is not productive, and reclamation activities are undertaken, the EA concedes that it would still take 5 to 10 years for sensitivity 1 visual quality standards to be met, and that some visual evidence of this work could be seen for as much as 30 years afterwards. (*Id*. at 39-40.) The EA concludes that "the cumulative effects for Alternative 2 along FSR [Forest Service Road] 4208 would be the same as for [Savoy's proposed project]. In the long term (5-30 years) the foreground would not meet the VQO for retention. . . ." (*Id*. at 40.)

The EA also notes that "during activities associated with drilling this well, numerous trucks will utilize FSR 4208." (*Id*. at 40.) This activity, the EA suggests, would be of limited impact since most of these activities would occur in the winter. However, the EA also concedes some increase in traffic "which could impact their [visitors'] recreational experience in the SPMN. . . . It would be evident to visitor [sic] in the area, and therefore, have an effect on the recreational experience." (*Id*.) The EA listed mitigation efforts, including the stockpiling of cut timber for future reclamation, the seeding of cleared areas, and the location of the production facility connected to River Lake Road by a curved access road. (Dkt. 30, Ex. A at 23-26.) These efforts are stated to be sufficient, and the EA asserts that these mitigation methods were successful on other well pads in the ranger district. (*Id*., App. B at 30.)

The EA then notes that a portion of the pipeline, as well as the production facility, runs adjacent to River Lake Road (also known as Hickey Creek Road). (*Id*., App. B at 40.) This road

is maintained by Crawford County and is used by private landowners in the area.  The EA recites that this roadway has a sensitivity level of 2 which represents "typical viewer interest."  Using standards set forth in the Forest Plan, the EA states that the area traversed by this road has a visual standard of "partial retention."  (*Id*. at 40-41.)  This standard "means management activities may be evident but must remain subordinate to the characteristic landscape."  (*Id*.)  The EA states that the activities planned by Savoy would include the removal of approximately 30 larger trees and a strip of vegetation next to the road approximately two feet wide.  (*Id*. at 41.)  An access road and a two-acre clearing for the production facilities are also planned.  Nonetheless, the EA concludes that with approval of Alternative 2, along with the placement of the production facility and design of the access road to the facility, there "would be no effect to the visual quality as the objective of partial retention would be met[,]" as "[v]isitors turning onto FSR 4209 near the production facility would not notice the clearing."  (*Id*.)

    **b.   Odor**

    With regard to potential odors caused by Savoy's project, the EA lists three potential sources:  the burning of vented hydrogen sulfide gas during drilling, odors caused by petroleum products stored to fuel the equipment associated with the drilling and producing, and odors associated with the drilling and production equipment itself.  (*Id*. at 43.)  The EA notes that there are 12 other gas wells in the Mio Ranger District and that "none of these wells produces a detectable odor," although the production facilities associated with the wells "have a very minor petroleum odor near the storage tanks and the exhaust from the compressor is detectable in the immediate vicinity."  (*Id*.)  The EA states that "to date the Forest Service has received no complaints" regarding a production facility and storage tank in the southwest corner of the SPNM area.  (*Id*.)  However, the EA concedes that "odors from the existing petroleum storage tanks are

detectable for a few hundred feet" and that "future oil and gas development could contribute odors. Short term [exhaust from heavy equipment and snowmobiles] and long term in the immediate vicinity of petroleum storage tanks and compressor odors could be experienced by visitors to the SPMN area." (*Id*.) The assessment points out that "if productive, wells and production facilities would also require heavy equipment for maintenance. This could happen a few times per year and last less than a week. This action could continue for the life of the well. The heavy equipment would have an exhaust odor in the immediate vicinity (100-200 feet) of the well in the production facility. This could also have an effect on visitors in the immediate vicinity." (*Id*. at 44.) Considering the cumulative effects of Savoy's proposed project, "[o]dors are expected to dissipate quickly and not be noticeable unless downwind or within 200 feet of the activity." (*Id*.) According to the EA, with approval of Alternative 2, "the odor from the storage tanks would not likely be detectable to people driving by the production facility most of the time." (*Id*.)

     **c.**    **Noise**

Turning to the noise expected to be generated by this project, the Defendants contracted with a sound consultant who undertook what appears to be an involved study of the issue. (*Id*. at 45-52.) The consultant assessed sounds presently expected to be heard in the Mason Tract and SPMN area. (*Id*. at 47.) The consultant then estimated the strength and duration of sounds expected from Savoy's project. (*Id*. at 48.) The consultant stated that construction, drilling, and installation of the proposed facilities would give rise to sound levels between 105 and 115 decibels. (*Id*.) The current ambient sound levels in the vicinity of the project were also measured and found to be approximately 24 decibels, a level consistent with a rural area and barely audible to the human ear. (*Id*. at 46, 49.)

The EA concedes that for a period of approximately 45 days during the construction of the well site and production facility, a noise level of approximately 115 decibels would be generated. This is approximately eight times as loud as the ambient noise level and is consistent with sounds generated by a thunderstorm or an elevated train. (*Id.* at 46.) Once construction is completed, the EA concedes that "after the initial 45 day drilling period, background noise may be heard at the Mason Tract Boundary and within the semi-primitive non-motorized area." (*Id.*, App. B at 23.)[10] The EA also concedes that with approval of Alternative 2, even with its attendant mitigation requirements, "the noise impact assessment showed that without considering wind, topography or vegetation, noise from the production facility [with the largest compressor] would be 12 decibels greater than the ambient sound level within 1,320 feet of the production facility. This is approximately twice as loud as the ambient noise level." (*Id.*, App. B at 17-18.) The same analysis shows that the sounds generated by the production facility, depending on the distance to various sites in the area, would be equal to or greater than the current ambient sound level. (*Id.*) The EA concedes that "a portion of the semi-primitive non-motorized area falls within each of these zones[.]" (*Id.* at 18.) The EA asserts that approximately one mile from the facility, "the human ear cannot detect that level of change." (*Id.*) The EA then concludes that Alternative 2 would cause no significant impact to the environment as to noise. (*Id.* at 20; Ex. B at 23-24.)

### d.    Application of Governing Legal Principles

As mentioned, Congress enacted NEPA for explicit purposes: to declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and

---

[10]This document also appears as an exhibit to the Government's Opposition to Plaintiffs' Motion for Temporary Restraining Order (Dkt. 26, Ex. E).

stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality. 42 U.S.C. § 4321.  However, the EA concedes that even with the mitigation requirements spelled out in Alternative 2, Savoy's activities would cause the areas adjoining Forest Service Road 4209 to violate the applicable visual quality standards for at least one, and possibly five to ten years. The EA concedes that Savoy's activities, whether or not resulting in a productive well site, would cause the areas adjoining Forest Service Road 4208 to violate the applicable visual quality standards for at least five to ten years and possibly as long as thirty years.  The EA concedes that Savoy's activities will cause increases in vehicular traffic, which would impact visitors' recreational experiences in the SPNM.  The EA states that Savoy's activities would require the removal of 30 large trees from the areas adjacent to River Lake Road, as well as the construction of a pipeline adjacent to the road, yet "there would be no effect to the visual quality" of this area. (*Id.*, Ex. B at 41.)  Even though the EA concedes that the "noise from the production facility [with the largest compressor] would be 12 decibels higher than the ambient sound level within 1320 feet of the production facility[,]" and that this sound level is "twice as loud as the ambient sound level . . .," all of which impact a semi-primitive non-motorized area which is intended to be one "with a large probability of isolation from sights and sounds of others[.]" (*Id.*, Ex. B, App. B at 17-18.)

This same EA describes at some length the portions of the National Forest through and over which Savoy's activities are contemplated to take place, and makes clear that these areas are among the most sensitive and cherished portions of the Huron Manistee National Forest.  The EA nonetheless concludes that with approval of Alternative 2, Savoy's activities will not cause any significant impact to these admittedly delicate areas.  Under the standards set forth in the law cited above, I suggest that this analysis amounts to a *non-sequitur*, and the conclusions made by the

Environmental Assessment and the FONSI which relies upon this Assessment are arbitrary and capricious.

These findings, I suggest, fail to comport with the CEQ regulations in a number of respects. While paying lip service to "the unique characteristics of the geographical area," and describing the "ecologically critical areas" involved in this project (*see* 40 C.F.R. §1508.27(b)(3)), the EA and the FONSI, which relies upon the EA, both effectively disregard these geographic characteristics in reaching its findings.  How alterations to scenic and primitive areas, the effects of which will be seen for between five and up to thirty years; how the doubling of the noise level in areas intended to be isolated from human contact; and how the clearing of over 5 acres of "old growth" forest, which is to "be managed primarily by allowing natural processes to occur[]"  (Forest Plan at IV-36) cannot be considered significant, is in both EA and FONSI left completely unexplained. I further suggest that the intensity of the public comment made at every opportunity makes clear that this project is "likely to be highly controversial" within the meaning of the CEQ regulations. 40 C.F.R. § 1508.27(b)(4).  This fact, I suggest, further undercuts the propriety of the EA and the FONSI.

As pointed out earlier, the NEPA unequivocally requires consideration of alternatives to the proposed action.  42 U.S.C. § 4332(2)(C).  Although the EA briefly considers alternative locations for this drilling project (Dkt. 30, Ex. B at 17-18), they appear in the EA to have rejected any alternative drilling sites out of hand.  The only consideration in any detail of alternative sites in less environmentally critical areas is not in the EA, but in its Appendix B.  There, in response to public comment, it is stated that Savoy's project location "is located at the limit of feasible distance based on safety issues and technological limitations for  testing the formation."  (*Id*., App. B at 17-18.) However, in the next paragraph it is stated that drilling from alternative sites, including from the

proposed production facility location, "is technically feasible, [but] it is not without risk." (*Id.*) This apparent dichotomy is left unexplained, and while various technical drilling issues are briefly summarized, nowhere are these technical risks balanced against the impact of Savoy's proposed project upon sensitive national forest areas.   In this circuit, "[i]t is our role . . . to determine whether the agency has, in fact, adequately studied the issue and take[n] a 'hard look' at the environmental consequences of its decision." *Crounse Corp. v. Interstate Commerce Comm'n.*, 781 F.2d 1176, 1193 (6th Cir. 1986).  As to the viability of alternative locations, I cannot say that Defendants have conducted adequate study.  In contrast to the Defendants' actions on this project, in *Burkholder v. Peters*, 58 Fed. App. 94 (6th Cir. 2003), the Ohio Department of Transportation, under the oversight of the Federal Highway Administration, sought and received additional data, hired a consultant in response to public concern relating to potential groundwater contamination from a highway project, and explained in an Environmental Assessment the basis for their conclusions.  Comparable actions have not been taken here, and I suggest that NEPA and the CEQ regulations do not accord Defendants the luxury of taking Savoy's explanations for the unsuitability of other drilling sites at face value.  Moreover, this portion of the Appendix ends with citation to a Department of Interior, Bureau of Land Management regulation which apparently prohibits Defendants from requiring leaseholders from moving proposed operations more than 200 meters.[11]  How this regulation can be said to comport with the unequivocal Congressional intent and statutory requirements of NEPA, or with the standards set forth in the CEQ regulations, is left completely unexplained by Defendants.

     The EA and the FONSI upon which it relies repeatedly state that no significant environmental impact should come about from Savoy's project because other wells within the

---

[11]*See* 43 C.F.R. § 3101.1-2.

same ranger district or the same county have not been seen as problems.  (Dkt. 30, Ex. A at 8,12; Ex. B at 29-30, 34, 43, 48.)  However, with the exception of a production facility said to be in the SPNM, the EA provides few if any details as to these other sites, such as whether they are within old growth forest, primitive areas, adjacent to scenic rivers, or within or adjacent to particularly cherished areas of the national forest.  Without any indicia of similarity,  I suggest these other sites cannot be considered comparable nor used to justify the Defendants' conclusions.

As noted earlier, the CEQ regulations make explicit that the Defendants must consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. "  40 C.F.R. § 1508.27(b)(7).  This same provision states that "significance cannot be avoided by . . . breaking it down into small component parts." (*Id.*)

As Judge Enslen noted in *Hirt v. Richardson,* 127 F. Supp. 2d 833 (W.D. Mich. 1999),

[c]ourts have also required that environmental effects of multiple projects be analyzed together when those projects will have a cumulative effect on a given region. *Kleppe,* 427 U.S. at 410, 96 S. Ct. 2718; *Andrus,* 825 F. Supp. at 1501. Finally, multiple stages of a development must be analyzed together when "the dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken." *Thomas v. Peterson,* 753 F.2d 754, 759 (9th Cir. 1985). *Compare Trout Unlimited v. Morton,* 509 F.2d 1276 (9th Cir. 1974) with *Sierra Club v. Watkins,* 808 F. Supp. 852, 864 (D.D.C. 1991).

*Id.* at 842.

The EA and the FONSI upon which it relies both point out, however, that if this well is productive, additional wells will be drilled in the area, and likely will use the same production facility Savoy seeks to build in this project.  (Dkt. 30, Ex. I, Ex. A.  at 4, Ex. B at 50.)  Many of these same documents recite the existence of numerous other productive wells in the region.  By a  straight-forward exercise of logic, it is therefore quite likely that this well will in fact be productive and therefore generate requests for additional drilling.  In spite of these facts, the EA

23

and FONSI are entirely silent as to the environmental effects expected from this additional drilling contrary to 40 C.F.R. § 1508.27(4), which requires consideration of the "degree to which the action may establish a precedent for future actions . . ."  Under these circumstances, I suggest that Defendants' consideration of a single well in what is in reality a phased project is exactly the sort of segmentation of environmental analysis the CEQ regulations sought to prohibit.

For all of these reasons, I suggest that the EA and the FONSI upon which it relies should both be declared inadequate, and an exercise of arbitrary and capricious decisionmaking.  I therefore suggest that Defendants be enjoined from relying upon these documents.

**2.      Biological Assessment ("BA")**

**a.      Overview**

Although the Biological Assessment is over 20 pages in length, the entire substantive analysis of the proposed impact of this project upon the Kirtland's warbler is contained in four paragraphs.  Noting that the closest occupied Kirtland's Warbler Habitat is approximately .4 of a mile south, southeast of the production facility, the BA states, "since there is no occupiable or occupied Kirtland Warbler breeding habitat within or directly adjacent to the proposed project area, Kirtland Warbler nesting habitat would not be created adjacent to the proposed well site and production facility in the future[.]"  (Dkt. 30, Ex. C at 14; AR at 132.)  The BA notes that limitations on the time of drilling would be such that the warblers would be in their wintering grounds and therefore not present during the project's construction.  The assessment then states that although approximately one mile of the proposed pipeline would be in the essential habitat area, Forest Service Road 4208 would be allowed to be widened only to the north to avoid essential habitat to the south.  (*Id*. at 14-15; AR at 132-33.)  Based on these conclusions, the assessment states that "it is determined that the proposed . . . project would have NO AFFECT on

24

the Kirtland's Warbler, and therefore the species will not be analyzed further[.]" (*Id*. at 15; AR 133; emphasis in original.)

The BA's entire substantive analysis of the effects of this project upon the Bald Eagle are contained in two paragraphs. Noting that the nearest known Bald Eagle nest is approximately three miles south, southwest of the project area, and that the nest was not active in 2004, the analysis concludes that because "there are no known or expected Bald Eagle nests, roosts or perches within the . . . project area," (*id*.) "it is determined that the proposed . . . project would have NO AFFECT on the Bald Eagle, and therefore the species will not be analyzed further." (*Id*. at 16; AR at 134; emphasis in original.)

### b.  Application of Governing Legal Principles

The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*., enacted in 1973, was passed for the purpose of  "provid[ing: (1) ] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved[; and (2)] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The key term in the ESA, "conservation," means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer necessary." 16 U.S.C. § 1532(3).

The ESA requires all federal agencies to consult with the Fish and Wildlife Service to ensure that their actions do not jeopardize the continued existence of an endangered species or result in the destruction or modification of that species' habitat. The ESA requires the Fish and Wildlife Service to designate critical habitats for endangered or threatened species. 16 U.S.C. § 1533(b).

One of the foundational premises of the ESA, 16 U.S.C. § 1536(a)(2), provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section.  In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

*Id*.

In short, the ESA attempts to insure the continued existence of endangered and threatened species.  The ESA mandates that defendants place conservation above any of the agency's competing interests.  The Supreme Court, in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978), found that,

> [t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, **whatever the cost** . . .   [T]he legislative history undergirding Sec. 7 reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species. The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies. . . . [T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable.

*Id*. at 2297 (emphasis added); *see also* 16 U.S.C. § 1531(c)(1) ("all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purpose of this chapter.")

In spite of these explicit mandates, entirely missing, I suggest, from the conclusory statements contained in the BA, and the FONSI which flows from it, is any meaningful consideration of the Forest Service's duty under the ESA to encourage the propagation and diffusion of endangered species.  Moreover, no consideration is given as to whether this project

would have the effect of enhancing habitat for the predators of the Kirtland's warbler, in particular, the cowbird, which as noted earlier, is a serious predator and threat to warbler reproduction.

Nor is any mention made as to how this project impacts the responsibility set forth in the Forest Plan to both "maintain and <u>develop</u> essential nesting habitat for the Kirtland's warbler." (Forest Plan at IV-174; emphasis added.) I therefore suggest that, while paying lip service to its duties, the BA, and the accompanying FONSI for this proposed project, amount to arbitrary and capricious action under the APA. As a result, I suggest that the BA and the FONSI upon which it relies, should both be declared inadequate and that the Defendants be enjoined from relying on these documents.

### E.    Conclusions

A review of particularly the Environmental Assessment and the Finding of No Significant Impact leaves this reader with the unmistakable impression that Defendants felt that they had little choice but to approve Savoy's drilling project. These documents are replete with references to various statutes, regulations and policy statements, and encouraging Defendants to open federal land to mineral development. (Dkt. 30, Ex. A at 2, 6; Ex. B at 11-13, 63.) The same documents, however, make at best only passing reference to the NEPA. They make virtually no mention of the numerous applicable provisions of the CEQ regulations. This sentiment is well, if unintentionally, expressed near the end of the EA where the authors state that implementation of either Savoy's original project request in Alternative 2 "would comply with the existing laws, policies and Forest Plan direction to make mineral resources available to the people of the United States to fulfill their energy needs." (*Id.*, Ex. B at 63). I suggest that it is hard to escape the conclusion that while Defendants acknowledge their environmental responsibilities and superficially mouth the appropriate platitudes, Defendants' conclusions lose sight of the seminal

principle that "[a]lthough NEPA's substantive and environment standards are flexible and leave room for agency discretion, NEPA's procedural requirements demand strict compliance.  *Calvert Cliffs' Coordinating Comm. Ins. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1112 (D.C. Cir. 1971)."  *United States v. City of Detroit*, 329 F.3d 515, 528 (6th Cir. 2003).  I therefore suggest that the Court grant  Plaintiff's Motion for Summary Judgment and  deny Defendants' Motion for Summary Judgment.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

s/ *Charles E. Binder*

CHARLES E. BINDER
Dated: June 20, 2006                                  United States Magistrate Judge

**<u>CERTIFICATION</u>**

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Mark R. Daane, Marianne G. Dugan, Aaron Isherwood, Gregory Daniel Page, Janet L. Parker and Bruce M. Pregler, and served in the traditional manner on Honorable David M. Lawson.


Dated:  June 20, 2006                                    By_____s/Mary E. Dobbick_____
                                                          Secretary to Magistrate Judge Binder